**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MCGRAW-HILL GLOBAL EDUCATION HOLDINGS, LLC, PEARSON EDUCATION, INC., and CENGAGE LEARNING, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>MEHUL MATHRANI, INDIA US EXPRESS INC., UNITED WORLDWIDE COURIERS, INC., ANKUSH SHARMA, ANSHOO SHARMA, and DOES 1-10.<br><br>Defendants. | Case No. **1:16-cv-08530-WHP**<br><br><br>**AMENDED COMPLAINT**<br><br>**and**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs McGraw-Hill Global Education Holdings, LLC, Pearson Education, Inc., and Cengage Learning, Inc. ("Plaintiffs"), for their Amended Complaint against Defendants Mehul Mathrani, India US Express, Inc., United Worldwide Couriers, Inc., Ankush Sharma, Anshoo Sharma and Does 1-10 ("Defendants"), hereby allege, on personal knowledge as to matters relating to themselves and on information and belief as to all other matters, as follows:

**NATURE OF THE CASE**

1.      This is a case involving egregious and extensive violations of the federal laws concerning copyright and trademark infringement.  It arises from the intentional importation, distribution, and sale of counterfeit textbooks at the expense of authors, students, publishers and others.

2.      Plaintiffs are leading educational publishers who develop, market, distribute, license, and sell a comprehensive range of traditional and digital educational content and tools to

professionals and students of all ages.  Plaintiffs' textbooks are among the most popular and widely used titles in their fields.

3.      Defendants are parties who have acted as key components of a massive international counterfeiting ring that victimizes Plaintiffs by misappropriating their creative efforts and valuable brands.  Defendants have distributed thousands of counterfeit textbooks and continue to do so.  The textbooks Defendants distribute into and within the United States marketplace are not the authentic items published by Plaintiffs, but are counterfeits that infringe on Plaintiffs' copyrights and trademarks.

4.      The nature and extent of Defendants' illicit counterfeit activities is already massive.  Moreover, discovery is likely to show that the activity Plaintiffs currently are aware of is only the proverbial "tip of the iceberg."

## JURISDICTION AND VENUE

5.      This is an action arising under the Copyright Act, 17 U.S.C. § 101, *et al.* and the Lanham Act § 32, 15 U.S.C. § 1114.

6.      This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

7.      Personal jurisdiction in this district is proper pursuant to N.Y. C.P.L.R. § 302 because Defendants (a) have committed acts of copyright and trademark infringement within New York, (b) have transacted business within New York in connection with the infringement alleged herein, and (c) have committed acts of copyright and trademark infringement outside the State, which caused injury to Plaintiffs within the State, and Defendants expected or should reasonably have expected such acts to have consequences in this State and derive substantial

revenue from interstate or international commerce.  Alternatively, personal jurisdiction in this district is proper pursuant Fed. R. Civ. P. 4(k).

8.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and 28 U.S.C. § 1400(a).

## THE PARTIES

9.      Plaintiff Pearson Education, Inc. ("Pearson"), is a Delaware corporation with its principal place of business at 330 Hudson Street, New York, New York 10013.

10.     Plaintiff McGraw-Hill Global Education Holdings, LLC ("MHE") is a Delaware limited liability company with its principal place of business at 2 Penn Plaza, New York, New York 10020.

11.     Plaintiff Cengage Learning, Inc. ("Cengage"), formerly Thomson Learning Inc., is a Delaware corporation with offices located in New York.

12.     Defendant Mehul Mathrani is an individual who resides at 6123 Mayapple Drive, Troy, Michigan 48085.  Defendant Mathrani sells counterfeit textbooks under his own name as well as fictitious names and/or borrowed names of individuals, possibly including family members, that assist him.

13.     Defendant United Worldwide Couriers, Inc. ("Worldwide") is a New York corporation with its principal place of business at 218 West 37th Street, 6th Floor, New York, New York 10018.  Defendant Worldwide also maintains a warehouse at 16743 148th Avenue, Jamaica, New York 11434.  Defendant Worldwide has acted as a point of contact in the United States for receiving counterfeit textbooks shipped from India and then re-distributing them.

14.     Defendant India US Express Inc. ("India US") is a New York corporation with its principal place of business at 135-02 Liberty Avenue, South Richmond Hill, New York 11419.

Defendant India US has acted as a point of contact in the United States for receiving counterfeit textbooks shipped from India and then re-distributing them.

15.     Defendant Ankush Sharma is an individual residing in India.

16.     Defendant Anshoo Sharma is an individual residing in India.

17.     Defendants Ankush Sharma and Anshoo Sharma distribute and sell into the United States counterfeit textbooks under: (a) their own names; (b) a variety of fictitious names or borrowed names of individuals assisting them; (c) the business names "AADI's Books" or "AADI Books Global Traders" (and/or some derivation of the foregoing); and, finally, (d) one or more sham India-based companies, which likely include CBR East & West Solution Private Limited, Mint-Deals Books Private Limited, and/or Kalawati Exports Private Limited.

18.     Defendants Does 1-10 are individuals or entities whose true names and identities are unknown to Plaintiffs at this time but who have distributed, offered for sale, and/or sold counterfeit textbooks as described herein and continue to do so.  The Doe Defendants also include the individuals and/or entities that financially benefit from the infringement of Plaintiffs' copyrights and trademarks and fail to exercise their right and ability to control the infringement, and/or that have knowledge of the infringement of Plaintiffs' copyrights and trademarks, or through the exercise of reasonable diligence and care should have such knowledge, and encourage or materially contribute to it.  Plaintiffs believe that information obtained in discovery will lead to the identification of the true names, identities, and locations of Does 1-10 and permit Plaintiffs to amend this Complaint to state the same.

### PLAINTIFFS' BUSINESSES, COPYRIGHTS, AND TRADEMARKS

19.     Pearson is a world-renowned publisher of educational books and multimedia materials in all subject areas and grade levels, operating under numerous imprints, with a rich

educational and literary heritage.  With well-known brands such as Pearson, Prentice Hall,

Pearson Longman, Pearson Scott Foresman, Pearson Addison Wesley, Pearson NCS, and many

others, Pearson provides quality content, assessment tools, and educational services in all

available media.

20.     MHE is a world-renowned publisher of educational books and multimedia

materials in all subject areas and grade levels, operating and publishing under many

distinguished and well-known imprints, with a rich educational and literary heritage.  MHE's

textbooks have achieved acclaim not only in the United States, but also in many other countries

around the world.

21.     Cengage is among the world's largest providers of tailored learning solutions. In

the academic marketplace, Cengage serves secondary, post-secondary, and graduate-level

students, teachers, and learning institutions in both traditional and remote learning environments.

Cengage's products and services are sold throughout the world, through direct channels and via a

worldwide network of distributors.

22.     Plaintiffs' publications include physical and digital textbooks (collectively,

"Textbooks").  Plaintiffs' Textbooks are widely available in the marketplace for sale, rental, or

subscription, including from physical and online bookstores.

23.     Plaintiffs are the copyright owners of, and/or the owners of the exclusive rights

under copyright in, *inter alia*, those works or derivative works consisting of the Textbooks

described on **Exhibit A** (hereinafter, "Plaintiffs' Authentic Works").  Plaintiffs, or their

affiliates, have each obtained registrations duly issued by the U.S. Copyright Office protecting

their respective copyrights in Plaintiffs' Authentic Works.

24.     Plaintiffs' Authentic Works bear trademarks and service marks as set forth on

**Exhibit B** (hereinafter, "Plaintiffs' Marks"), which Plaintiffs or their affiliates have duly

registered on the Principal Register of the United States Patent and Trademark Office.  Plaintiffs

own or are the exclusive licensee of Plaintiffs' Marks.  Plaintiffs' Marks are distinctive and

arbitrary and in some cases are now incontestable under Section 15 of the Lanham Act, 15

U.S.C. § 1065.  All of the registrations listed on **Exhibit B** are valid, subsisting, unrevoked, and

not cancelled.  Plaintiffs also own common law rights in these and other trademarks.

25.     Plaintiffs invest heavily in publishing their Textbooks.  Each year they incur

substantial costs for author royalties and other costs of content creation or licensing, copyediting

and proofreading, typesetting, layout, printing, binding, distribution, promotion, and for support

of their editorial offices.

26.     Plaintiffs and/or their predecessors have also invested decades of effort in

building a reputation of quality in the publishing industry, which consumers associate with

Plaintiffs and their trademarks.  Plaintiffs invest significant resources annually in the worldwide

advertisement and promotion of their goods and services under their respective marks.

Plaintiffs' Marks and the goodwill of the business associated with them in the United States and

throughout the world are of tremendous value and have become associated in the public mind

with Plaintiffs' reputation for publishing Textbooks of the very highest quality.

## DEFENDANTS' UNLAWFUL ACTIVITIES

27.     Beginning not later than 2015, and continuing today, Defendants have worked in

active concert and participation with one another as part, or in furtherance, of one joint scheme to

distribute and sell counterfeits of Plaintiffs' Authentic Works bearing Plaintiffs' Marks

(hereinafter, the "Counterfeit Textbooks").

28.     Defendants, without any authorization or license from Plaintiffs, have knowingly and willfully distributed the Counterfeit Textbooks and continue to do so.  Plaintiffs did not print, or authorize the printing of, the Counterfeit Textbooks.  Plaintiffs did not ever sell, or authorize others to sell, the Counterfeit Textbooks.

29.     Defendants, without any authorization or license from Plaintiffs, have knowingly and willfully used and continue to use Plaintiffs' Marks in connection with the advertisement, distribution, offer for sale, and/or sale of the Counterfeit Textbooks.  The Counterfeit Textbooks are not genuine.  Defendants purport to sell the legitimate and authorized versions published by Plaintiffs, but actually distribute counterfeit versions.

30.     Defendants' infringing activities are substantial.  **Exhibit A** describes the Counterfeit Textbooks that Defendants have distributed or sold, which Plaintiffs have discovered to date.  **Exhibit A** is representative, not comprehensive, and will be updated over the course of discovery in this action.

31.     Defendants perpetrate their illegal activities in various ways.  One such means involves a complicated ruse whereby Defendants sell Counterfeit Textbooks to one or more wholesalers utilizing an online "buyback" tool on the wholesaler's website.  Defendants also maintain one or more online storefronts on Internet marketplaces including Amazon.com.  Defendants likely sell the Counterfeit Textbooks through other channels as well.

32.     Chegg, Inc. ("Chegg") is a national wholesaler with a website at www.chegg.com.  Chegg's website contains an automated, online "buyback" tool that allows students to sell their used textbooks to Chegg.  The prospective seller enters the item(s) they wish to sell.  The Chegg buyback tool immediately quotes the price Chegg is willing to pay and an allowable quantity.  If the seller wishes to proceed, the buyback tool enables the seller to print a shipping label and ship

the book to Chegg at Chegg's expense using Chegg's account with United Postal Service ("UPS").  The seller must create an account with Chegg, which includes providing a name, email address, physical address, and payment information.  Once Chegg processes and approves the purchased books, it renders payment to the seller.

33.     Defendants sold thousands of Counterfeit Textbooks to Chegg through its buyback tool.  Chegg then sold many of the Counterfeit Textbooks to another wholesaler, MBS Textbook Exchange, Inc. ("MBS"), and others.  MBS determined that the books were likely to be counterfeits and notified Plaintiffs.  Plaintiffs inspected the textbooks and confirmed that they were indeed Counterfeit Textbooks, as well as being new rather than used.  Plaintiffs inspected other textbooks sold by Defendants to Chegg and still in Chegg's possession, and determined them to be Counterfeit Textbooks as well.  In addition to the Counterfeit Textbooks that Plaintiffs inspected, Defendants sold well over 10,000 other textbooks to Chegg.  Those books have already been re-sold into the marketplace and presumably also are counterfeit.

34.     While creating accounts with Chegg to sell their Counterfeit Textbooks, Defendants hold themselves out as persons or businesses located throughout the United States, including in New York.  Defendants, who are professional sellers, not students, sometimes use their real names and addresses when creating the accounts.  In many other instances, Defendants create accounts using fictitious names and addresses, or borrowed names and addresses of real people, in order to sell the Counterfeit Textbooks to Chegg.  To circumvent Chegg's policies that limit the number of books that it will buy from any individual seller, Defendants created hundreds of such seller accounts.  Defendants also have tried to evade detection by selling new books as "used."

35.     IP addresses captured by Chegg indicate that individuals using computers in India accessed Chegg's online buyback tool, obtained quotes, and generated UPS labels to ship the Counterfeit Textbooks to Chegg. These individuals are the India-based Defendants, including Ankush Sharma, Anshoo Sharma, and/or others working with or for them. They provided the Counterfeit Textbooks to one or more shipping companies, sometimes also known as "freight forwarders," for delivery from India into the United States. While using Chegg's buyback tool, Defendants have used New York addresses, among others, as the addresses from which they will ship the textbooks to Chegg via Chegg's UPS account. Other Defendants based in the United States, including Defendant Mathrani, also have used Chegg's online buyback tool for transactions.

36.     Plaintiffs are not aware that Defendants have shipped any Counterfeit Textbooks to Chegg directly from India. However, Defendants have sent thousands of Counterfeit Textbooks from India to companies in the United States that, among other things, provide services for receiving and shipping packages. In the past, this has included three freight forwarders located near John F. Kennedy Airport, including Defendants India US and Worldwide, and, to a much lesser extent, a third freight forwarder. The aforementioned Defendants India US and Worldwide have played a critical role in the illegal scheme, acting as the conduit for the Counterfeit Textbooks to make their way into the United States. Defendants' Counterfeit Textbooks are sent to Defendants India US and Worldwide in boxes that already bear the UPS label for shipment to Chegg. After removing the UPS-labeled boxes from the outer shipping carton, Defendants India US and Worldwide provided the boxes to UPS for delivery to Chegg. Defendants India US and/or Worldwide also sent the Counterfeit Textbooks from India to Defendant Mathrani, and likely others, in the United States. Mathrani then sold such books to

Chegg and others.  Records obtained from Defendant Worldwide, as well as a customs clearance broker, identify AADI's Books or AADI Books Global Traders (business aliases used by Defendants Ankush Sharma and Anshoo Sharma) as the originating seller in India for many of the Counterfeit Textbooks sold to Chegg and others.

37.    While Defendants sometimes used fictitious account information, they provided Chegg with working email addresses that identify the PayPal accounts through which they receive payment.  Some of the PayPal accounts are in Defendants Ankush Sharma and Anshoo Sharma's names.  Other PayPal accounts identify fictitious names or the borrowed names of individuals assisting Defendants, including Ashok Bakshi, Poonam Chauhan, Pankaj Nirwan, Buhvnesh Kumar, Kamla Nirwan, Praveen Kumar Sharma, Rajesh Kumar, and Vandana Chauhan.  These accounts also identify a variety of associated email addresses.  A number of the email addresses overlap across accounts, which provides further evidence that the Counterfeit Textbooks sales to Chegg are part of a single, large-scale counterfeit scheme.

38.    Defendants' illegal scheme is not limited to sales of Counterfeit Textbooks to Chegg via its online buyback tool.  Several other for-profit wholesalers maintain similar automated, online buyback programs, including:  AbeBooks, Inc. (www.abebooks.com); Alibris, Inc. (www.alibris.com); Better World Books (www.betterworldbooks.com); BookByte (www.bookbyte.com); BookStores.com, LLC (www.bookstores.com); and Follett Corporation (www.follettbooks.com).  Looking to maximize their illicit profits, Defendants have every incentive to expand their sales of Counterfeit Textbooks to these additional wholesalers, and it appears that they have done so.  Records obtained from one wholesaler indicate that some of Defendants' email addresses and IP addresses were also used to sell them textbooks.  Plaintiffs already have obtained information indicating that thousands of books have been shipped to these

other wholesalers, including in the same manner as the Counterfeit Textbooks sold to Chegg via

its online buyback tool.  Thus, discovery is likely to reveal that Defendants sold Counterfeit

Textbooks to other wholesalers in addition to Chegg.

39.     The records Plaintiffs uncovered indicate that, in addition to the shipments to

Chegg, thousands of books shipped to these other wholesalers, in bulk, including from the same

geographic area in India and also via "UPS handover" for delivery to the respective wholesaler.

Many of these shipments identify the seller as "Bhavesh Books," with the email address,

bhaveshbooks@gmail.com, rather than AADI's Books or AADI Books Global Traders.

Nevertheless, the bhaveshbooks@gmail.com email address is associated with PayPal accounts

used to receive payment for Counterfeit Textbooks sold to Chegg, which, as described above,

trace back to AADI's Books or AADI Books Global Traders.  This too is further evidence that,

notwithstanding the variety of names and contact information used, the sales of Counterfeit

Textbooks alleged herein are part of a single, large-scale counterfeiting ring.

40.     As mentioned above, Defendants also sell Counterfeit Textbooks via one or more

storefronts on online marketplaces.  Thus, Defendants sell Counterfeit Textbooks both to

wholesalers and to individual consumers via online marketplaces.  For example, Plaintiffs

purchased a Counterfeit Textbook from a storefront on the Amazon.com marketplace called

"Prudendflowers."  Plaintiffs sent a notice of infringement to Amazon regarding the Counterfeit

Textbook obtained from "Prudendflowers."  After Amazon provided the contact information for

"Prudendflowers," it became apparent that Defendant Mathrani created the storefront using the

fictitious name "Louis Hill," rather than provide his true identity.  In so doing, Defendant

Mathrani made false representations of fact to, and breached his contractual agreement with,

Amazon.  Continuing this charade, Defendant Mathrani sent an email to Plaintiffs' counsel

wherein he represented that his name was Louis Hill.  However, the telephone number "Louis

Hill" provided to Amazon for the "Prudendflowers" account is registered to Defendant Mathrani.

Mathrani no longer denies operating the "Prudendflowers" storefront under the false name

"Louis Hill."

41.      Defendants' activities, as described above, demonstrate that Defendants know that

the Counterfeit Textbooks they distribute are infringing.  Defendants know that neither they nor

their suppliers are authorized to reproduce Plaintiffs' Authentic Works or use Plaintiffs' Marks

on textbooks or to distribute the Counterfeit Textbooks, yet Defendants nonetheless distribute

such Counterfeit Textbooks.  All the Defendants materially participate in and jointly operate the

illegal counterfeiting scheme.  In particular, Defendants Ankush Sharma and Anshoo Sharma not

only shipped Counterfeit Textbooks to Defendants Worldwide and India US and others for UPS

handovers to Chegg, but they also directed the Counterfeit Textbooks to Defendant Mathrani and

others for resale.  Defendants Ankush Sharma, Anshoo Sharma, and Mathrani also used their

various email addresses interchangeably to sell the Counterfeit Textbooks to Chegg.

42.      By infringing Plaintiffs' copyrights and trademarks, Defendants cause Plaintiffs to

suffer serious financial injury.  The revenue from Plaintiffs' sales and rentals of Textbooks

represents a substantial portion of Plaintiffs' respective annual revenues, and is therefore

important to their financial health.  Both publishers and authors alike are deprived of income

when their Textbooks are unlawfully copied and sold, or when their copyrights are otherwise

infringed, which can have serious financial and creative repercussions for them and their work.

A substantial decline in revenue from sales or rentals of Plaintiffs' Textbooks could cause

Plaintiffs to cease publication of one or more deserving Textbooks.  This would have an adverse

impact on the creation of new Textbooks, on scholarly endeavor, and on scientific progress, by

making it more difficult to publish deserving Textbooks.

43.     The Counterfeit Textbooks that Defendants sold are inferior to Plaintiffs'

Authentic Works.  Among other differences, the binding, glue, paper, color, and printing are

often different and inferior.  Based on the use of Plaintiffs' Marks, actual and prospective

purchasers are likely to believe that the Counterfeit Textbooks are Plaintiffs' Authentic Works.

Because the Counterfeit Textbooks are inferior, this weakens, blurs, and tarnishes Plaintiffs'

Marks.  It further injures Plaintiffs' business reputations by causing Plaintiffs' Marks and the

goodwill associated with them to be confused or mistakenly associated with a group or series of

textbooks of lesser quality.

**FIRST CLAIM**
**DIRECT AND SECONDARY COPYRIGHT INFRINGEMENT**
**(In Violation of 17 U.S.C. § 106)**

44.     Plaintiffs re-allege and incorporate as if fully set forth herein the allegations set

forth in paragraphs 1-43 above.

45.     Plaintiffs' Authentic Works constitute original works and copyrightable subject

matter pursuant to the Copyright Act and Plaintiffs or their affiliates have obtained registrations

duly issued by the U.S. Copyright Office protecting their respective copyrights in Plaintiffs'

Authentic Works.

46.     At all relevant times, Plaintiffs have been and still are the owners, or exclusive

licensees, of all rights, title, and interest in and to their respective copyrights in Plaintiffs'

Authentic Works, which have never been assigned, licensed, or otherwise transferred to

Defendants.

47.     Beginning no later than early 2015, and continuing today, Defendants, with knowledge of Plaintiffs' duly registered copyrights in the Authentic Works, have infringed Plaintiffs' copyrights.  Defendants did more than supply the means to facilitate the infringement of Plaintiffs' copyrights; they substantially participated in and orchestrated such infringing activities.

48.     Defendants infringed the copyrighted Authentic Works by, among other things, distributing and selling the Counterfeit Textbooks, without the permission, license, or consent of Plaintiffs, in violation of Plaintiffs' exclusive rights to reproduce and/or distribute their Authentic Works pursuant to 17 U.S.C. § 106.  Accordingly, Defendants are liable for direct copyright infringement.

49.     Defendants also knowingly engaged in, supervised, and/or controlled the distribution, sale, and importation of the Counterfeit Textbooks, and had a direct financial interest in, and stood to gain a direct financial benefit from their deliberately infringing activity.  By engaging in the illegal conduct alleged above, in addition to directly organizing and effectuating such infringing activities, Defendants personally induced, caused, and materially contributed to infringing conduct by others, including resellers to whom Defendants sold the Counterfeit Textbooks for further distribution.  Accordingly, Defendants are liable for contributory and vicarious copyright infringement.

50.     Defendants' wrongful conduct, as set forth above, was deliberate, intentional, knowing, malicious, and willful.

51.     Defendants' wrongful acts will continue unless enjoined by this Court.

52.     Defendants' acts have caused, and will continue to cause, irreparable injury to Plaintiffs.  Plaintiffs have no adequate remedy at law and have been, and will continue to be,

damaged in an amount to be determined.

## SECOND CLAIM
### TRADEMARK COUNTERFEITING AND INFRINGEMENT
#### (In Violation of 15 U.S.C. § 1114(1)(a))

53.     Plaintiffs re-allege and incorporate as if fully set forth herein the allegations

contained in paragraphs 1-43 above.

54.     Section 32(1)(a) of the Lanham Act, 15 U.S.C. § 1114(1)(a), prohibits any person

from using in commerce, without the consent of the registrant, any registered trademark or any

reproduction, counterfeit, copy, or colorable imitation thereof in connection with the sale,

offering for sale, distribution, or advertising of goods or services on which such use is likely to

result in confusion, mistake, or deception.

55.     Defendants have used in commerce spurious designations that are identical to, or

substantially indistinguishable from, Plaintiffs' Marks on goods for which Plaintiffs hold federal

trademark registrations.  Defendants, without the consent or authorization of Plaintiffs, have used

these spurious designations in connection with the manufacturing, advertising, sale, offering for

sale, and/or distribution of goods for their own financial gain.

56.     Defendants use in commerce of a reproduction, counterfeit, copy, or colorable

imitation of Plaintiffs' Marks in conjunction with the Counterfeit Textbooks is likely to cause

and is causing confusion, mistake, and deception among the general purchasing public as to the

origin of the Counterfeit Textbooks, and is likely to deceive the public into believing the

Counterfeit Textbooks being sold by Defendants originate from, are associated with, or are

otherwise authorized by Plaintiffs, all to the damage and detriment of Plaintiffs' reputation,

goodwill, and sales.

57.     Defendants engaged in these wrongful activities while having notice and

knowledge of (i) Plaintiffs' well-known and prior rights in Plaintiffs' Marks, (ii) the fact that Defendants' Counterfeit Textbooks bear marks which are intentionally and confusingly similar to Plaintiffs' Marks, and (iii) that such use of Plaintiffs' Marks has not been authorized or licensed by Plaintiffs.

58.     Defendants' acts as described in this Complaint constitute trademark counterfeiting and/or infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114(a)(1).

59.     Defendants' unlawful conduct, as set forth above, was deliberate, intentional, knowing, malicious, and willful.

60.     Defendants' wrongful acts will continue unless enjoined by this Court.

61.     Defendants' acts have caused, and will continue to cause, irreparable injury to Plaintiffs.   Plaintiffs have no adequate remedy at law and have been, and will continue to be, damaged in an amount to be determined.

## PRAYER FOR RELIEF

By reason of the acts and circumstances alleged above, Plaintiffs seek relief from this Court as follows:

A.     Judgment on each of the claims set forth above, including that Defendants' infringement of Plaintiffs' Authentic Works and Marks was intentional and willful.

B.     An accounting and disgorgement of Defendants' profits, gains, and advantages realized from their unlawful conduct, including a reconciliation of all purchases and sales of the Counterfeit Textbooks.

C.     Pursuant to 17 U.S.C. § 502, an order enjoining Defendants from further infringing upon Plaintiffs' respective copyrights.  Without limiting the foregoing, or any other

relief the Court may deem appropriate, Plaintiffs request that Defendants, their officers, agents, servants, employees, and all persons in active concert with them, be temporarily, preliminarily, and permanently enjoined from:

1) Reproducing, distributing, displaying, or importing any unauthorized copies of any of Plaintiffs' copyrighted works;

2) Encouraging, assisting, or inducing anyone else to reproduce, distribute, display, or import any unauthorized copies of any of Plaintiffs' copyrighted works or financially benefitting from the same; and

3) Shipping, delivering, holding for sale, selling, returning, transferring, or otherwise disposing of in any manner any unauthorized copies of any of Plaintiffs' copyrighted works.

D.       Pursuant to 15 U.S.C. § 1116, an order enjoining Defendants from further counterfeiting, or otherwise infringing upon, Plaintiffs' respective trademarks.  Without limiting the foregoing, or any other relief the Court may deem appropriate, Plaintiffs request that Defendants, their officers, agents, servants, employees, and all persons in active concert with them, be temporarily, preliminarily, and permanently enjoined from:

1) Using Plaintiffs' trademarks or any reproduction, counterfeit, copy, or colorable imitation of Plaintiffs' trademarks in connection with the distribution, advertising, offer for sale, and/or sale of merchandise that are not Plaintiffs' genuine products;

2) Passing off, inducing, or enabling others to sell or pass off any counterfeit books as Plaintiffs' genuine products; and

17

3) Shipping, delivering, holding for sale, selling, distributing, returning, transferring, or otherwise disposing of in any manner any books or other items falsely bearing Plaintiffs' trademarks, or any reproduction, counterfeit, copy, or colorable imitation of the same.

E.     Pursuant to 17 U.S.C. § 503 and 15 U.S.C. § 1118, an order requiring Defendants to deliver up for destruction all products, packaging, labels, literature, advertising, and other material bearing imitations or reproductions, including confusingly similar variations, of Plaintiffs' respective copyrights and trademarks.

F.     Pursuant to 17 U.S.C. § 504, an order requiring Defendants to pay to Plaintiffs such damages as Plaintiffs have sustained as a consequence of Defendants' unlawful acts of copyright infringement as alleged above, including actual damages or statutory damages at Plaintiffs' election.

G.     Pursuant to 15 U.S.C. § 1117(a) or (b), an order requiring Defendants to pay to Plaintiffs up to the trebled amount of such damages as Plaintiffs have sustained as a consequence of Defendants' unlawful acts of trademark counterfeiting and infringement as alleged above and all profits that Defendants have derived while using counterfeits or infringements of Plaintiffs' trademarks; or, in the alternative, pursuant to 15 U.S.C. § 1117(c), statutory damages of up to $2,000,000 for each trademark that Defendants have counterfeited or infringed.

H.     Pursuant to 17 U.S.C. § 505 and 15 U.S.C. § 1117(a), an order requiring Defendants to pay Plaintiffs' attorney's fees and costs associated with this litigation.

I.     Pre-judgment and post-judgment interest at the applicable rate.

J.     Such other and further relief the Court deems proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury

of all issues that are so triable.

DATED:  March 17, 2016
          Washington, D.C.

Respectfully submitted by:

*/s/ Kerry M. Mustico*

Matthew Jan Oppenheim
Kerry M. Mustico (N.Y. Bar No. 4190534)
OPPENHEIM + ZEBRAK, LLP
5225 Wisconsin Avenue NW, Suite 503
Washington, DC 20015
 (202) 480-2999 Telephone
 (866) 766-1678 Facsimile
matt@oandzlaw.com
kerry@oandzlaw.com

*Counsel for Plaintiffs McGraw-Hill Global
Education Holdings, LLC, Pearson Education, Inc.,
and Cengage Learning, Inc.*

19